# IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| CONNIE L. MORRIS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.:  **CV-10-BE-2402-S** |
| | ) | |
| THE BESSEMER BOARD OF | ) | |
| EDUCATION, et. al., | ) | |
| Defendants | ) | |

## MEMORANDUM OPINION

This matter, asserting claims of retaliation and gender discrimination brought pursuant to Title IX and Title VII, is before the court on "Defendant's Motion for Summary Judgment." (Doc. 92).  The court has received thorough briefing on that motion.  For the reasons stated in this Memorandum Opinion, the court finds that the motion is due to be GRANTED in part and DENIED in part.  Specifically, certain of the Plaintiff's claims are due to be DISMISSED because the Plaintiff has abandoned them or failed to exhaust them, and the motion for summary judgment is due to be DENIED as to all remaining claims.  The claims that will proceed to trial are (a) the retaliation claims brought pursuant to Title IX and Title VII regarding the failure to hire the Plaintiff for the following positions: (1) Head Girls Basketball Coach for the 2010-2011 season; (2) Head Girls Basketball Coach for the 2011-2012 season; (3) summer weight training coach for the summer of 2010; and (4) strengthening coach for 2010-2011; and (b) gender discrimination claims regarding the failure to hire the Plaintiff for the following positions:  (1)

summer weight training coach for the summer of 2010; and (2) strengthening coach for 2010-2011.

## I. INTRODUCTION[1]

The Plaintiff, Connie Morris, is a woman who has roared for years about equality for the girls basketball program in the Bessemer City School system.  She has stood toe to toe with administrators, and, according to Morris, she has paid the price.  But, she keeps coming back, not a novice any longer to discrimination complaints, more determined to achieve her final goal. The court does not doubt the conviction in Morris's soul.  The question before this court is not whether Morris is invincible, either as a coach or as an advocate for women's rights in her school system.  Rather, the court's task is to determine whether Morris has presented sufficient evidence in support of her discrimination claims under Title IX and Title VII to survive the current motion for summary judgment and to try those claims in front of a jury.

## II. PROCEDURAL HISTORY

The Defendant, the Bessemer Board of Education, has employed the Plaintiff, Connie L. Morris since 1993, and her employment history includes her previously filing EEOC charges against the Board as well as a previous lawsuit in 2008, bringing claims under Title VII and the Equal Pay Act, which the court "resolved against her on summary judgment on November 4, 2009."  (4th Am. Compl. ¶ 13, Doc. 81, at 6).

On March 18, 2009, the Plaintiff, Connie L. Morris, filed another EEOC Charge, this time asserting that the Board discriminated against her based on sex, and retaliated against her.

---

[1] This introduction includes numerous references to song lyrics from *"I am Woman,"* co-written by Helen Reddy and Ray Burton.  The court does not intend its reference to these lyrics to reflect in any way on the merits of Morris's claims.

Specifically, Morris claimed that the Board retaliated against her and created a hostile work environment by monitoring her class room on a continual basis; retaliated against her and discriminated against her by prohibiting her from hiring a qualified assistant coach when the Board allows male coaches to hire assistant coaches; and discriminated against her by paying female assistant basketball coaches half the wages paid to male assistant basketball coaches, which affected Morris's ability to hire the best, experienced assistant coaches.

On August 31, 2010, Morris filed yet another EEOC Charge, marking boxes for discrimination based on sex, retaliation, and age.  In this Charge, she focused on her termination as Head Girls Basketball Coach, noted that the Board hired a younger woman for the position, and claimed that it discriminated against Morris on the basis of age.  Further, she claimed that beginning in March 2010, the Board subjected her to retaliation and discrimination based on gender in the terms and conditions of her employment, including refusing to hire her for positions of either Training Coach or Strengthening Coach, and hiring men instead.

Over a year later, on November 18, 2011, Morris filed an EEOC Charge alleging discrimination based on sex and retaliation.  She referred to her termination as Head Girls Basketball Coach in 2010 and stated that her termination was also in retaliation for the protected activity of advocating on behalf of the female athletics programs and other gender-based protected activity.  When the Board failed to re-hire her as Head Coach in the summer of 2011, she claimed that its failure to do so constituted retaliation for her protected activity.

On September, 3, 2010, Morris initially filed with this court an application under Section 706(f) of the Civil Rights Act, requesting court-appointed counsel and permission to proceed *in forma pauperis.*  (Doc. 1).  The court denied those requests, and ordered Morris to file a

complaint that complied with the Federal Rules.  (Doc. 2).  Morris subsequently obtained counsel and filed a Complaint and several amended versions.  After the "Substitute Second Amended Complaint" (doc. 31), filed February 16, 2011, the Board filed a motion to dismiss (doc. 38). The court held a hearing on that motion, and subsequently entered a Memorandum Opinion (doc. 52) and Order (doc. 53) granting the Motion to Dismiss in part and denying it in part.

After the court's Order on the first Motion to Dismiss, Morris filed a third (doc. 60) and fourth Amended Complaint (doc. 81).  The Fourth Amended Complaint, the latest version, contained the following claims: Count I (entitled "Title IX Retaliation Against Defendant Board"); Count II (entitled "Title VII Retaliation Against Defendant Board"); Count III (entitled "Title VII - Sex Discrimination Against Defendant Board"); and Count IV (entitled "42 U.S.C. § 1983 - First Amendment Violation Against Defendant Board & Defendant Foster").

On July 13, 2012, Morris filed a "Joint Stipulation for Partial Dismissal" (doc. 87), stipulating to the dismissal with prejudice of Count IV as asserted against Foster and the Board, and, because Count IV was the only remaining claim against Defendant Foster, agreeing to the full dismissal of Defendant Foster.  The court subsequently dismissed Count IV and Defendant Foster as a party Defendant (doc. 88), thus leaving the Board as the only Defendant.

On July 17, 2012, the Board filed the Motion for Summary Judgment (doc. 92) currently before the court, addressing all remaining claims in Counts I - III.

# III.  FACTS[2]

## *The Parties and Board Employees*

The Board currently employs Morris as a physical education teacher.  Jerome Cook has served as Principal of the Bessemer City High School for approximately nine years, during the events made the basis of this suit.  As Principal, he was responsible, among other things, for school operations and for interviewing employment applicants and otherwise considering applicants.   In addition to that position, Cook also served, during some of his tenure, as the Athletic Director for the high school athletic programs, a position whose duties included the selection of head coaches with Board approval.  During other years, specifically from 2008 to 2010,  Keith Mahaffey, an employee of the school system since 1975, served in the Athletic Director position.

Other City employees who became involved in the matters made the basis of this suit are Birma Wilson, whom the City employed as Human Resources Director from 2002 until December 21, 2011 and whose duties included recruitment, personnel file maintenance, facilitating of candidate interviews, investigating personnel misconduct,and drafting and posting job announcements; Vera Eades, who has served as a member of the City School System's Board for the last ten years and held the position of Board Vice President from 2008 to 2010 and president from 2010 to 2011; John Douglas, who served as Assistant Principal at Bessemer High School and acted as Morris's supervisor; and Michael Foster, who served as the City School System's Superintendent either in an interim or permanent capacity from October 30, 2008 until

---

[2] The court presents these facts in the light most favorable to Morris, the non-movant; they may not be the facts proven at trial.

he retired on June 30, 2011.  As Superintendent, Foster was the chief executive officer of the Board and his duties included presiding over Board meetings, preserving Board records, ensuring compliance with laws and Board rules and regulations, and making personnel recommendations to the Board.

*Protected Activity*

**General**

Morris testified that throughout her years of coaching in the Bessemer City School System, she has been an outspoken advocate of equal treatment for female athletics.  During those years, she had a practice of attending regular and specially-called Board meetings as well as Board work sessions.  Throughout her employment, she regularly complained to Board members about the following treatment, which differed from the treatment of coaches for boys  teams and of male athletes: (1) the Board's refusal to purchase appropriate weight training equipment for female athletes; (2) the unavailability of the system's weight training facility to the girls basketball team; (3) the failure to provide the girls basketball team with game film, pre-game meals, hotel and food allowances for away games; (4) Morris's lack of access to the gym to train the girls basketball team; (5) the failure to allow Morris the opportunity to choose assistant coaches; (6) the denial to Morris of professional development training; (6) the refusal to credit vendor donations to the girls  basketball team; and (7) the refusal to allow Morris excused absences from teaching after late basketball games.  In addition to these general categories of on-going complaints, Morris made the following specific complaints.

### 2008 Discrimination Lawsuit

On June 19, 2008, Morris filed a lawsuit against the Board, alleging discrimination

pursuant to Title VII and Equal Pay Act.  The court dismissed that lawsuit in November of 2009.

Principal Cook was aware of Morris's 2008 lawsuit and testified that he understood Morris had

sued him personally in one suit.

### March 18, 2009 EEOC Charge

On March 8, 2009, Morris filed an EEOC Charge checking boxes for discrimination in

the following areas: retaliation, sex, and Equal Pay Act.  In that Charge, she claims that after

filing the 2008 lawsuit,

> the employer has monitored my class room every 20-30 minutes on a
> continuing basis creating an intimidating and hostile work environment.
> On or about February 2, 2009, I was prohibited from hiring an assistant
> coach whom I interviewed and was qualified for the position. . . .Male
> coaches are not restricted from hiring assistant coaches.  Male coaches
> are allowed to hire coaches after their seasons.  Female assistant
> basketball coaches are paid one half of the wages paid to male assistant
> basketball coaches, which affect [sic] my ability to hire the best
> experienced coaches.  I have continually complained about being treated
> differently than the male coaches.
>
> The employer has informed me that I could not hire the coach whom I
> interviewed because it was too late in the basketball season.  The
> employer has offered pro-ration as the reason why female basketball
> coaches are paid less wages than their male counter part.

(Doc. 89-14).

### December 15, 2009 Board Meeting

In a December 2009 memo to Athletic Director Mahaffey and at the December 2009

Board meeting, Morris complained about a November 2009 proposed change in the girls

basketball team practice time from 4:00 p.m. to 6:00 p.m., claiming in the memo that bumping

7

girls varsity team in favor of a non-varsity boys team was a *Title IX* violation.  She ended the

letter with the charge: "This clearly indicates to me that you too, feel that because I am female, I

am supposed to be <u>inferior</u> to any male coach, and that Coach Butts is obviously over the total

basketball program!  I will file a grievance before the board as soon as possible in efforts to

rectify this situation." (Doc. 90-19, at 2).  She copied Principal Cook and Superintendent Foster

on this memo.

### Spring 2010

On April 5, 2010, Morris complained to Athletic Director Mahaffey, among other things,

about an alleged lack of access to the girls  basketball team's game film.

At some unspecified time in the 2009-2010 year, Morris complained to Principal Cook

that the Board did not provide her team with adequate resources for travel to tournaments.  The

background for that complaint was the sub-state tournament in Hanceville, Alabama.   At the end

of the 2009-2010 season, the girls basketball team qualified for that tournament, and on February

8, 2010,  Mahaffey requested and received Board permission for the team to participate.  On

February 10, 2010, Morris sent a memo to Mahaffey requesting permission for the girls team to

stay overnight in Hanceville on Monday of President's Day, a school holiday, before the

tournament game on Tuesday.  Mahaffey denied the request for an overnight trip, because the trip

to Hanceville could be accomplished the day of the tournament and because no funding was

available for overnight accommodations.  Morris, the assistant coaches, the players, and some of

the players' parents chose to travel to Hanceville on Monday where they spent the night before

the tournament, paying their own costs for transportation and lodging, and did not inform Cook

of their plans to do so.  Board policy provides that the school principal controls all school-sponsored activities and extracurricular activities.

In the Spring of 2010, Morris complained to Principal Cook in writing about being denied the opportunity to attend a conference scheduled for April 2010, phrasing the complaint as one of gender discrimination:

> I strongly feel that I am being personally discriminated against and these actions are personal and discriminatory!  All males, who hold the same or similar positions as myself, have been allowed to gain professional development on more than one occasion this school year. . . . I strongly feel that this is a part of the retaliation, which is unacceptable!  Please understand that I will NOT tolerate such behavior in the workplace because it is an unlawful practice that I do not have to endure.  Therefore, I am prepared to take all measures necessary to correct the constant ongoing retaliatory acts of discrimination that I receive in the Bessemer City School System.  Furthermore, I strongly feel that my pleas and complaints continue to fall upon death [sic] ears and I've taken all of the steps necessary and followed the appropriate chain of command in an attempt to resolve these issues within the system.  There are numerous discriminations that take place on a daily basis.  It appears that because I have integrity, I make a stance for doing what is right, and because I am female, with more knowledge than my male counterparts, my employment terms and conditions have been altered.  Therefore, I am writing this letter as an official grievance to you in efforts to resolve this issue.

(Doc. 91-4, at 1). Cook had told Morris that no funds were available for professional development and Morris did not know how much money, if any, was available for that purpose.

### *EEOC Charge August 2010*

On August 21, 2010, Morris filed an EEOC Charge checking the following boxes for discrimination: sex, age, and retaliation.  It states in part:

On or about May 23, 2010, the Board terminated me as the girls basketball coach and hired a woman who is younger than the age of forty years and who has far less experience than me. I believe I have been discriminated against on the basis of my age. During the period beginning in March 2010, my employer has subjected me to different terms and conditions of employment than similarly situated male coaches.

The Board has denied me professional development opportunities; has refused to accept donations to the girl's basketball program which [sic], and has refused to reimburse me for job-related expenditures. My employer has denied me opportunities for advancement in that, in June 2010, it refused to hire me to either the Training Coach or Strengthening Coach positions I applied for and instead hired males. In an attempt to diminish my success as an athletics coach, my employer failed and refused to procure weight training equipment appropriate for use by the School's female basketball players and necessary to their overall physical fitness and my success as an athletic coach. In an attempt to diminish my success as a female athletics coach, my employer failed and refused to make available for use by the female basketball players the School weight training facility.

(Doc. 89-15).

### EEOC Charge November of 2011

In an EEOC Charge filed on November 18, 2011, Morris checked boxes for sex and retaliation, and stated, among other charges, that in June of 2011, the Board failed to rehire her as Head Coach of the Girls Basketball Team "in retaliation for my advocacy of the female athletics programs at the School, in retaliation for my protected Title VII activity and because of my gender."

#### Challenged Hiring Decisions

As noted previously, Morris identifies several positions that she claims she was qualified to hold but asserts that the Board failed to hire her for those positions for discriminatory reasons. Those positions are Girls Head Basketball Coach, summer weight training coach, and strengthening coach.

10

### Girls Head Basketball Coach

In addition to her job as physical education teacher, Morris also previously served in other capacities.  From 1993 to June 2010, she held the position of Head Girls Basketball Coach with a winning program and a winning record every season.[3]  In the 2009-2010 girls  basketball season, the team record was 26 wins and 3 losses, and the Board recognized the girls basketball team at a Board meeting.  Mahaffey, the Athletic Director from 2008 to 2010, testified that he was pleased and satisfied with Morris's performance as Head Coach.  One of her claims of discrimination concerns her termination and non-renewal for that Head Coach position.

### Board Process and Policies regarding Head Coach Employment Candidates

The Board process for hiring head coaches required posting the job announcement, the Athletic Director and the HR Director screening of applicants' qualifications and making interview determinations, the arranging of an interview panel, and the setting up of interviews. All applications for such positions must be in writing, signed, and dated, and Board policy provided that applications must "remain on file and active for not less than 12 months."  (Ds Ex. 22a).   Superintendent Foster testified that when minimum job qualifications were changed during his tenure, except where federal or state law mandated changes, a written proposal for those changes would come before the Board for approval and a written document would reflect that change. Board policy requires that each candidate for a head coach position be interviewed before being hired, and the interview panel for head coach positions would consist of the Athletic Director, the school principal, and could also include a teacher from the school in question and/or

---

[3] Morris's undisputed fact number 2 states that Morris had "a winning record possibly every season."

the HR Director.  However, if a large number of candidates apply, all of whom meet the

qualifications, a screening process would take place.  Wilson, the HR director, testified that if

only three qualified people timely applied for a job, an Interview Panel would interview all three.

Cook understood the process differently; although at one point in his deposition he

acknowledged that existing personnel applying for positions should be interviewed, he also

testified that as Principal, he had the discretion to determine whether interviewing the candidates

was necessary, and he said the Principal himself can choose a candidate without interviews and

without invoking an interview panel.  In any event, when an interview panel is invoked, panel

members complete Interview Analysis Forms on each applicant, ranking each candidate from

zero to four.  After interviews and candidate ranking, the Superintendent recommends to the

Board the person to be hired, and the HR Director testified that she was unaware of any recent

instance in which the highest ranked head coach candidate did not get re-appointed to the

position.   The Board cannot act on its own in hiring candidates but must have a recommendation

by the Superintendent.

*Process for Renewing Position of Head Coach*

Coaching positions in the Bessemer system are non-tenured; the Board has a mandated

practice of non-renewing all coaches at the end of every school year, and no guarantee exists that

any coach will receive her job back for the next school year.  When a current coach wishes to be

considered for the job the next year, she must provide to the Board a letter of intent or an

application.  The Board's practice is to reappoint incumbent head coaches who express an

interest through a letter or application, who run a successful program, and who do not have

performance or background problems.  For example, in 2010, the Board did not re-appoint

12

coaches who were guilty of misconduct or who did not express an interest in being re-appointed because they were relocating elsewhere.  For years, the Board has only considered individuals for coaching positions who had some type of connection or previous employment relationship with the school system

For applicants and/or current coaches to be hired or re-hired for the position of girls basketball coach in the Bessemer system, the Board Superintendent recommends a candidate and then the Board votes on that candidate.  Sometimes, the Athletic Director makes recommendations to the Superintendent regarding the coach position, which the Superintendent has no obligation to accept.

Pursuant to the Board's policy, although Morris held the position of Head Girls Basketball Coach for a decade, she was non-renewed at the end of every school year and re-hired again each summer for the upcoming year. Morris's official personnel file contained no complaints against her.  Although complaints were lodged in 2006 and 2007 that Morris berated student players, Cook investigated these complaints and was unable to corroborate them.

*2010 - 2011 School Year/Basketball Season*

In approximately January of 2010 but, in any event, before the March 2010 non-renewal of coaches, Cook  told Superintendent Foster that he wanted to "go in a different direction," making a "whole-hearted change" in the coaching staff.  Cook testified that he advised Foster that he was changing every coach to "secure some camaraderie amongst the student body, staff," to "bring some energy, trying to bring a lot more community togetherness into the athletic program," to "make the students have a little bit more school spirit," and to "see if we could basically secure a [state championship] title."  In addition to his duties as Principal, Cook was

13

serving as Athletic Director for the first time in 2010.  That "change in direction" meant that Cook would not recommend that Morris be re-hired, even though the previous season, 2009-2010, Morris had a successful year with no complaints lodged against her. Cook testified that the ultimate goal for that change was to see that the school would win a state title.

Assistant Principal John Douglas testified that in the Spring of 2010, Cook advised him that another reason he wanted to move in a new direction with Coach Morris was his personal issues with her, calling Morris a "b-i-t-c-h. . .any time he would say anything to her . . . she would sue or threaten to sue or something along that line."  When asked whether Cook told Douglas why Cook was concerned about Morris suing, Douglas stated, "I know he told me before that, you know, she had a lawsuit or something along that line toward him. . . .[Cook's] words was, when we were sitting there talking, he said that. . .he was going to get rid of the whole coaching staff. . .and at the same time that, you know, therefore, he wouldn't have to worry about Coach Morris saying that, you know, he was picking on her or anything like that." (Douglas, at 10-11, pp. 40-45).  Similarly, Tiffany Stephens, a player on Morris's basketball team,  recalls during the 2009-2010 basketball season overhearing Cook talking to another administrator about Morris and discussing how she would be fired the next year. Stephens recalled that Cook and the other school administrative staff did not acknowledge the victories and accomplishment of the girls basketball team to the same extent as those of the boys team.

In March 2010, all coaches, including Morris, were non-renewed as of the end of the 2009-10 school year.  After that non-renewal, Morris made the following complaints: on April 5, 2010, she complained about an alleged lack of access to the girls  basketball team's game film.

14

At some unspecified time, she also complained to Cook that the Board did not provide her team with adequate resources for travel to tournaments.

In May of 2010, Morris informed Cook of her interest in remaining in her position as Head Girls Basketball Coach, and confirmed that communication with a Letter of Interest to Cook in June of 2010. Both communications occurred before the Board took any action regarding the filling of that position.  Morris was not offered or scheduled for an interview in conjunction with her June 2010 Letter of Interest.  No Interview Analysis Sheets exist for any candidate regarding the Head Girls Basketball Coach position for the 2010-2011 school year.

 The 2010 posting for the 2010-2011 positions of Bessemer City Schools coaches, including Head Girls Basketball Coach, with an advertisement period of June 1, 2010 until filled, contained the following list of qualifications:

> 1.  Applicant must have successful coaching experience in another high school or college system and should be able to document this experience along with proof of college or professional playing experience in the sport to be coached.[4]
> 2.  Applicant should be able to work with young men and women and willing to put in long hours for the development of a successful athletic and physical education program;
> 3.  Such alternatives to the above qualifications as the Board may find appropriate and acceptable.

---

[4] The text of the 2010-2011 posting that the Board submitted for the Head Basketball Coach position contained different wording.  For example, in the Board's submission, the requirement of a "successful coaching experience" did not include a further qualifier "in another high school or college system," but simply required success "in assigned sport." (Doc. 89-17). Unlike the document Morris submitted, the document the Board submitted did not specify that it applied to the *Girls* Head Basketball Coach and did not specify dates that the description was in effect.  Because Gordon did not have previous high school or college coaching experience, the difference between the two documents is significant.

(P's Ex. 13).  The Board did not formally approve any alternatives to these qualifications; the

minutes reflect no such change.  In June of 2010, Morris met the list of qualifications on this

posting.

     In addition to Morris, Benita Gordon applied for the head coach position by sending an

email to Wilson and Cook and perhaps also to Foster, expressing her interest in the position,

referencing her history with Bessemer City Schools playing under Coach Morris, and listing or

attaching a list of her qualifications.  The Board did not present Gordon's email as evidence.  The

Board did present an unsigned, undated email that purported to be from Benita Gordon stating

only:

          Benita Gordon

          To Whom It May Concern:
          I would like to express my interest in the position of Head Girls Basketball
          Coach at Bessemer High School.  I can be contacted at  -2299.

          Thanks

          Benita Gordon

(Doc. 99-20).  In her deposition testimony, Gordon acknowledged that she did not recognize this

email, and stated that it certainly was *not* the email she sent in 2010 regarding the head coach

position, because that email referenced her history of playing for Coach Morris and included or

attached her qualifications.  She stated that this email could possibly be the email she sent in

2011 expressing an interest in renewing her position.

      Gordon had received a Bachelor of Science degree in physical education and a Master's

in Education in 2009. Although Gordon was not a teacher at the high school, she could arrive to

coach the varsity team after school hours. She had a background in basketball, winning a

16

basketball scholarship to college and playing on the college team for three years.  Further, she had coached in the Amateur Athletic Union as assistant coach in her first year and head coach in the second year.  Gordon had no high school or college coaching experience, but she had coached at the junior high school level for a couple of years.  Seven of the twelve players who played on the high school team she coached in the 2010-11 season were players that she had previously coached at the junior high level.  Gordon had also played basketball under Morris as her coach. Gordon does not recall being interviewed for the position, but the first response she can recall after her email application was Cook calling her on the telephone in July or August of 2010 and advising her that the Board had approved her as head coach.

Cook testified that because he was looking for a change and because only two people applied for the Girls Head Basketball Coach position, he felt no need to interview Morris for the job.  He did call Gordon and talk to her about the position over the phone, but he did not establish a panel to interview her.  Despite the posted requirement that the candidate have prior experience coaching at the high school or college level, Cook deemed Gordon's coaching experience at the middle school level to be satisfactory.

In June of 2010, Cook recommended to the Human Resources Department that Benita Gordon replace Morris in that position for the 2010-2011 year.  Superintendent Foster received that recommendation and he then recommended to the Board that Gordon be hired.  If Cook had recommended that Morris be hired, Foster testified that Morris would have been the candidate he recommended to the Board; he trusted the judgment of Cook and did not look into the reasons for Cook's recommendation of Gordon instead of Morris.  Although Foster stated that Cook's recommendation of Gordon instead of Morris did not raise any red flags, HR Director Wilson

17

said that the recommendation did raise red flags with her because of Morris's successful coaching history.  The Board subsequently approved Cook's recommendation, hiring Gordon, without conducting any independent review or analysis, and the Board cannot now locate an HR file for the 2010 selection of the Head Girls Basketball Coach.

In the summer of 2010, Cook advised Morris that she would not continue in her position as  Head Girls Basketball Coach, and that he wanted to go in a different direction.  In his deposition testimony, Cook explained that "different direction" meant he wanted to increase the potential for capturing a state title.  He further testified that although Gordon had learned under Morris, he hoped Gordon could identify better with her players and provide new energy because she was younger.

Although Cook did not mention this reason for nonrenewal to Morris herself, he also testified that another reason for replacing her was that she violated AHSAA (Alabama High School Athletic Association) rules, that she had berated her players, and that she failed to control the actions of the parents of her team members.  As to the AHSAA rules, Cook testified that Morris violated those rules during one of her last two years of head coach by playing her team in pink uniforms in observance of breast cancer awareness when AHSAA rules required teams to wear school colors, and the Bessemer City High School colors did not include pink.  Cook acknowledged, however, that he did not keep any record of the violation, the year it occurred, and the fine, if any, that the school may have paid.  Mahaffey, who was the Athletic Director during Morris's last few years of Head Coach, testified that he could not recall any AHSAA violations by Morris or the girls basketball team during the 2008-2009 or the 2009-2010 season. The evidence presented does reflect letters in 2009 and 2010 from the AHSAA to Cook advising him

18

of violations and related fines involving the *boys football* and basketball programs but not the *girls basketball* program, and the Board does not dispute that the Board reappointed the coaches of those teams despite the AHSAA violations.  Morris denied that either she or the teams she coached received AHSAA violations during the years 2008 -2010.

As to berating her players, Cook testified that he had investigated complaints that Morris had berated her players in front of spectators and found substantiation for them.  However, despite his alleged findings and their effect on his desire to go a different direction for the head coaching position, he acknowledged that he did not put anything about the investigation in Morris's personnel file.  As to the actions of team parents, Cook testified that the parents of the team members chose to transport their own children to a tournament in Hanceville, Alabama on a Monday legal holiday instead of waiting for the school system to transport them to the tournament the next morning.  Cook holds Morris responsible for the parents' transportation of their children to the tournament instead of using school system transportation, but Mahaffey acknowledged that if the parents elected to do so, neither he nor Morris was responsible for those actions.

Despite Cook's claim that he was making such big changes throughout the 2010-2011 coaching staff, Cook recommended the reappointment of thirteen existing coaches either for the same or another coaching position for that year. Three of those coaches were reappointed even though their football program had been cited for AHSAA violations.

*2011-2012 School Year/Basketball Season*

 For the 2011-2012 school year, Cook recommended all of the same coaches to be re-hired as held the positions the previous school year, including the re-hiring of Gordon for the

19

Head Girls Basketball Coach position.  The proffered reason for that decision was to give the coaches additional time to improve their teams.  The posted qualifications for the head coach positions for 2011-2012 year were the same as for the previous year.  For the 2011-2012 year, Morris did not submit a letter of interest to Cook, Mahaffey or the Board's Human Resources Department for the  Head Girls Basketball Coach position, because Cook told Morris he intended to retain all incumbent coaches.  Nevertheless, her application from the previous June was on file and active for a year, pursuant to Board policy.  A dispute exists whether Gordon formally applied for that position in writing; the Board claims that she did and Gordon testified that she sent an email to Principal Cook and Wilson in HR advising them of her interest in being re-hired as coach, but Morris argues that the unsigned document upon which the Board relies – with no designation of the year, the coaching position, or the date submitted –  is not evidence that Gordon applied for the 2011-2012  Head Girls Basketball Coach position.  Neither Morris nor Gordon received interviews for the position.  In her November 2011 EEOC Charge, Morris claimed that the Board's refusal to re-hire her as coach for the 2010-2011 year was in retaliation for her purported advocacy of female athletics and protected activity and/or because of her gender.

During the 2011-12 year under Gordon, the girls  varsity basketball team's record was 26 wins and 4 losses, the same number of wins and one more loss than the team's 2009-2010 season under Morris.

### Summer Weight Training and/or Strengthening Coach

In June 2010, Morris timely applied for the position of strengthening coach and summer weight training coach.  Although she was qualified for those positions, in 2010, she did not

20

receive a recommendation that she be hired for those positions, and the Board did not offer those positions to her or hire her for either position.

Two years before, in 2008, Morris had applied for those same two positions. The strengthening coach is a year-round position with a $1,200 stipend. The summer weight training coach trained during the summer only with a stipend split amongst coaches. A dispute exists whether the Board hired Morris for either position in 2008. In her affidavit Morris stated that the Board never offered those positions to her, and never hired her for those positions, and that she never declined those positions. As to the 2008 strengthening coach position, the Board presented evidence, which Morris disputes, that although Cook recommended Morris for that position, Morris declined because she wanted more money than the offered stipend. As to the summer weight training position, a dispute exists whether the Board hired Morris for that job in 2008. Morris testified that  the Board never hired her, while the Board presented evidence that it hired her for that position but that she failed to show up and work at that position, and so the Board refused to pay her.

In any event, the Board hired five people to serve as a summer weight training coaches for 2010, four men and one woman. The 2010 Personnel Action Report reflects that their hiring was effective 7/20/10 and provided a supplement of $1,000. The Board did not hire Morris for that position in 2010, and did not hire Morris for the 2010 strength coach position; the 2010 Personnel Action Report reflects that it hired Joe Edwards for the strengthening coach position at the end of July 2010 with a salary of $1,200. In her August 2010 EEOC Charge, Morris alleged discrimination and/or retaliation associated with the Board's refusal to hire her in 2010 as a summer weight training coach and strengthening coach.

Morris did not submit a letter to be considered for summer weight training coach and strengthening coach for the 2011-12 period, because Cook told Morris he would retain all incumbent coaches for that year.

## IV.  DISCUSSION

### A.  Counts I & II - Title IX & Title VII Retaliation

In these counts, Morris claims that from a period beginning in 2008, she repeatedly complained to the Board about the unequal treatment of the female athletics program, and that the Board retaliated against her for those complaints.

*Title VII - Administrative Exhaustion of Retaliation*

The Board raises the issue of administrative exhaustion regarding Morris's Title VII claims in Count II of the Fourth Amended Complaint, filed in 2012, about the failure to hire her for the positions of summer weight training coach and strengthening coach.  The Fourth Amended Complaint refers to both positions and the entire period from "September 2008 to present" when it describes in Count II the Board's discriminatory failure to hire Morris.

As to the claims in Count II regarding the position of summer weight training coach, Morris exhausted her administrative remedies for the Board's hiring decision *during the summer of 2010*, filing an EEOC Charge in August of 2010 regarding that employment action.  As the Board points out, Morris did not exhaust her administrative remedies as the claims in Count II for failure to hire Morris for summer weight training coach *for the 2011 summer*.  Further, in their briefs, the parties do not even address the failure to hire Morris as summer weight training coach *for the summer of 2009*, and Morris provides no evidence or documentation that she has exhausted her remedies as to that employment decision. Therefore, Morris has not established

that she exhausted her administrative remedies as to the failure to hire her as summer weight training coach in 2009 or 2011.

As to the claims in Count II regarding the position of strengthening coach, Morris exhausted her administrative remedies for the failure to hire her for the *2010-2011 position*; the August 2010 EEOC Charge also specifically refers to that employment decision.  Yet, as the Board points out, no charge complains about the failure to hire Morris for that position in *2011-2012*, and the parties' briefs do not address the years of *2008-2009, 2009-2010*, and point the court to no document reflecting the exhaustion of administrative remedies as to those years. Therefore, Morris has not established that she has exhausted her administrative remedies as to the failure to hire her as strengthening coach for the years 2008-2009, 2009-2010, and 2011-2012.

The court will GRANT partial summary judgment and DISMISS WITH PREJUDICE those unexhausted claims.

*Abandoned Claims*

Morris's Fourth Amended Complaint identifies in Counts I and II a number of actions as retaliation that Morris does not address in her responsive brief:  (1) the refusal to purchase weight training equipment appropriate for the female athlete; (2) the refusal to allow Morris to miss work on game days without a loss of her accrued sick or personal time; (3) the refusal to provide game film to Morris; (4) the denial of Morris's requests for reimbursement for travel, food, and team apparel expenses; (5) the refusal to provide Morris with overnight accommodations and food allowances for out-of-town games; (6) the refusal to make travel, food, and hotel provisions for Morris as Head Coach in connection with the 2010 State Regional Tournament; (7) the

refusal to allow Morris's number and selection of assistant coaches; (8) the refusal to allow

Morris equal access to the school gym; (9) the denial to Morris of professional development

training opportunities; (10) the refusal to credit Morris with excused absences on days following

late basketball games; and (11) the refusal to allow Morris to report late to work on days

following late game nights. The Board argued in its brief that these other actions did not meet

the requisite minimum level of substantiality that the Eleventh Circuit required, and that

summary judgment was due to be granted as to this list of actions that did not involve failure to

hire for job positions.

      In her responsive brief, Morris failed to respond to this "lack of substantiality" argument,

and did not address adverse employment actions[5] *other than* the failure to hire or re-hire Morris

for job positions. Accordingly, the court FINDS that Morris has abandoned all claims for

retaliation based on the Board's actions *other than* its failure to hire or re-hire Morris for job

positions. *See, e.g., Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta,* 219

F.3d 1301, 1326 (11th Cir. 2000) (stating that the "failure to brief and argue this issue during the

proceedings before the district court is grounds for finding that the issue has been abandoned");

*Lyes v. City of Riviera Beach, Fla.*, 126 F.3d 13808, 1388 (11th Cir. 1997) (noting that "'the

onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied

upon in summary judgment are deemed abandoned'") (citation omitted), *reh'g granted and*

---

     [5] Morris's responsive brief referred to Morris's complaints about the failure to provide the
girls team with support comparable to the boys team and Morris's complaint about financial
support for attending a state regional tournament. However, the brief characterized those
complaints as protected activity that brought about adverse employment actions; it did not
characterize the lack of comparable support as an adverse employment action nor did it raise the
lack of funding for the state regional tournament as an adverse employment action.

*vacated by*, 136 F.3d 1294 (1998), *reinstated by* 166 F.3d 1332, 1336 (11th Cir. 1999) ( en banc).

Further, although Count II refers to the "discriminatory denial of the position of the Athletic Director," Morris does not address this claim in her brief; the court FINDS that she has abandoned all claims regarding the position of Athletic Director.  *See id.*

Although the Title IX claims in Count I of the Fourth Amended Complaint allege, among other things, that the Board retaliated against Morris by refusing to hire her as the strengthening coach and coach from "September 2008 to present," Morris does not address in her brief the claims regarding the failure to hire her for the strengthening coach in the years 2008-2009, 2009-2010, and 2011-2012 nor does her brief address her claim for summer training coach for the summer of 2009 and 2011.  Therefore, the court FINDS that she has abandoned those Count I claims.

In her Title VII claims in Count II, Morris similarly alleges  that the Board retaliated against Morris by refusing to hire her as the strengthening coach and coach from "September 2008 to present;" however, the court has already ruled above that Morris failed to exhaust  claims for hiring decisions covering the summer weight training position for the summers of 2009 and 2011, and the strengthening coach position for the years 2008-2009, 2009-2010, and 2011-2012. As an alternative ruling, to the extent Morris may have exhausted her administrative remedies for those employment decisions, the court FINDS that she has abandoned those claims.

Therefore, the court will GRANT partial summary judgment and  DISMISS WITH PREJUDICE those abandoned claims discussed above.

*Merits -Retaliation Claims*

Having determined that the court will dismiss the claims that Morris has abandoned and failed to administratively exhaust, the retaliation claims that remain are the following claims brought pursuant to Title IX and Title VII: (1) the Board's failure to re-hire Morris as Head Coach for the 2010-2011 season; (2) the Board's failure to re-hire Morris as Head Coach for the 2011-2012 season; (3) the Board's failure to hire Morris as summer weight training coach for the summer of 2010; and (4) the Board's failure to hire Morris as strengthening coach for 2010-2011.

Because the Supreme Court did not provide any specific framework for analysis of claims under Title IX, courts have applied to Title IX claims the same analysis used for discrimination claims brought pursuant to Title VII.  Therefore, as the only applicable difference in the analysis of the claims is that Title IX does not require plaintiffs to exhaust administrative remedies prior to filing suit (*see Cannon v. University of Chicago,* 441 U.S. 677, 706 n. 41 (1979)), the court will address these retaliation claims together.  Under Title VII, where no direct evidence of retaliation exists, a plaintiff must establish the following elements for a *prima facie* case of retaliation:

> 1.  Plaintiff engaged in activity protected by [Title VII/Title IX];
> 2.  The protected activity was known to the defendant;
> 3.  The defendant thereafter took adverse employment action against the plaintiff;
> 4.  There is a causal connection between the protected activity and the adverse employment action.

*Meeks v. Computer Assn. Intern.,* 15 F.3d 1013, 1021 (11th Cir. 1994) (Title VII analysis).  In its brief, the Board addresses elements three and four.  However, the Board concedes that Morris has

established element three as to the retaliation claims that would remain after the court's dismissal of claims outlined above.  Therefore, the court need only address element four of the *prima facie* case.

Element Four: Causation

The Board argues that no causal connection exists between the failure to hire/re-hire Morris for those positions and the protected activity.  It argues in part that because Morris "does not recall the exact dates when she raised concerns about inequitable treatment of female athletics," she cannot establish a causal connection between those complaints and the adverse employment action.  (Def.'s Br., Doc. 93, at 21, p. 18)  It further argues that although Morris did present evidence of several of Morris's memoranda dated from 2008 through April 2010 and challenging "a host of administrative decisions," those memos were dated more than three months before the decision not to hire/re-hire her, and thus, were too distant in time to establish a causal connection. (Def.'s Br., Doc. 93, at 22-23, p. 19-20).

The Eleventh Circuit does not view the fourth element as narrowly as the Board does. Instead, the Court of Appeals has explained that the "causal link element is construed broadly so that 'a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" *Pennington v. City of Huntsville,* 261 F.3d 1262, 1266  (11th Cir. 2001) (citations omitted*).*

Applying that broad construction to the instant case, the court finds that Morris meets her *prima facie* case as to the four hiring/re-hiring adverse employment actions.  Although Morris does present general evidence that she complained throughout her tenure with Bessemer City Schools about gender discrimination, Morris also presents evidence of numerous, specific

27

complaints she made to the Board and to her school administration about gender discrimination. For example, she complained in writing about her treatment in December of 2009 and April of 2010 and phrased those complaints as unlawful discrimination and as gender-based and threatened to take action outside the school.  The next opportunity after these complaints of gender-based discrimination for Cook and the Board to make a hiring decision on the Head Coach position and the summer weight training and strengthening positions was the summer of 2010, and, despite her qualification for those positions, the Board did not hire her for them.  Morris presents further evidence that in the Spring of 2010, Cook – who was responsible for making the recommendation to the Board for the positions in question and did not recommend Morris – explained to Douglas that one reason he planned to make changes in the coaching staff, including the Head Girls Basketball Coach position, involved Morris's complaints.  Therefore, Morris presented evidence that, if viewed in the light most favorable to Morris, would establish that the protected conduct and the 2010 adverse employment actions were not completely unrelated; she has established her *prima facie* case as to the 2010 actions.

The court acknowledges the Board's argument that because three months or more elapsed between Morris's protected activity and the adverse employment decisions, no temporal proximity can exist to create a causal connection.  The Board cites *Thomas v. Cooper Lighting, Inc.,* 506 F.3d 1361, 1364 (11th Cir. 2007) as support for that argument.  *Thomas* involved an employee who worked as an assembler and floater and who was terminated approximately three months after he accused his supervisor of sexual harassment based on two "sexually-tinged comments." The Eleventh Circuit found that, where no other evidence existed tending to show that the

28

protected activity caused the termination, three months' temporal proximity alone was not enough to establish causation.  *Id.* at 1364.

The court finds the *Thomas* case to be distinguishable from the instant case for multiple reasons.  The employer in *Thomas* was not a school Board that had prescribed, distinct time frames for employment decisions.  In the instant case, because all coaching positions are non-renewed every year and all employment decisions on coaches are made in the summer for the following school year, the summer of 2010 was the first opportunity after the protected activity in December 2009 and the Winter and Spring 2010 for an adverse employment action to occur.  In any event, the causation element here does not rest on mere temporal proximity; Morris presents evidence, for example, of Douglas's testimony about statements from Cook, the decision maker, tending to show that the employment decisions involving Morris were not unrelated to her protected activity.

The Board also argues that evidence exists of Cook's contemplating the adverse employment action *prior to* the protected activity, and thus, a causal connection cannot exist.  The Board has indeed presented evidence that in early 2010 Cook communicated his intention to "go in a new direction" with the coaching staff; however, the Board is wrong to assume that such evidence necessarily prevents Morris from establishing a *prima facie* case.  The evidence reflects that Morris engaged in protected activity *prior to 2010*; for example, she had complained specifically about sex discrimination and Title IX violations in December of 2009.  Evidence that Cook began verbalizing his desire to change the coaching staff shortly after the December 2009 protected activity – and further, that his later conversations with Douglas tied his desire to Morris's complaints and a strategy to let her go with a group so that she could not complain that

29

he was picking on her  – supports the establishment of her *prima facie* case rather than precludes it.

The Board also points out that Cook had filed lawsuits and EEOC Charges in the past, and yet, had been renewed as Head Coach after some protected activity.  It argues that the Board's re-hiring her as coach for the 2009-2010 season, after that protected activity, preludes a finding of causation in 2010 and afterwards.  The Board will have an opportunity to make an argument to the jury that its renewal of her coaching job in 2009 shows lack of retaliatory animus. However, common sense dictates that the Board's failure to retaliate in 2009 does not necessarily prove that the Board did not retaliate in 2010 and 2011, when Morris continued to complain of discrimination and to engage in protected activity after the renewal of her coaching job in 2009. Put another way, the court cannot find as a matter of law that because the Board failed to retaliate in 2009, it could not thereafter be guilty of retaliation, especially when Morris's protected activity continued.  In sum, Morris has established her *prima facie* case as to the 2010-2011 positions.

As to the 2011-2012 positions, the only claim that remains is the Head Coach position. Because Cook's approach to hiring for 2011-2012 was simply to renew all coaches who held the positions the previous year, and because Morris has established her *prima facie* case as to the 2010-2011 Head Coach position, the court further finds that Morris has established her *prima facie* case as to the decision on the 2011-2012 Head Coach position, also.  The court notes that Morris engaged in *additional* protected activity between those two seasons, filing an EEOC Charge in August of 2011 complaining about the failure to re-hire her as Head Coach, the failure to hire her as summer weight training coach and strengthening coach, and other gender-based discrimination.

30

The court also notes that Morris did not formally re-apply for the Head Coach position for the 2011-2012 school year.  However, her failure to do so is not fatal to her claim regarding that school year. "Courts have long recognized circumstances in which a failure to apply [for an employment position] may be overcome by facts which demonstrate the futility of such application." *Terry v. Cook*, 866 F.2d 373, 378  (11th Cir. 1989).  The evidence in this case reflects that Cook had told Morris he intended to retain all incumbent coaches for that school year, and, as a result of that communication, she did not submit a letter of interest.   Based on this evidence, the court finds that Morris has presented facts arguably demonstrating that submitting an application would have been futile*,* and, in any case, her application from the previous summer was on file and remained active for a year.  Thus, the court finds that her claim for retaliation may proceed as to the Head Girls Basketball Coach for the 2011-12 season.

Pretext

To the extent Morris does establish her *prima facie* case, the Board argues that it is still entitled to summary judgment because it has articulated legitimate, non-retaliatory reasons for its employment decisions and because Morris has not established that those reasons were pretextual. The court acknowledges that the Board's articulated reason for not renewing Morris's Head Coach job – wanting to move in a new direction in the hopes of ultimately securing a state basketball title –  is a legitimate, non-retaliatory reason.

However, contrary to the Board's argument, Morris has presented evidence that, if the jury believed it and/or accepted the inferences raised, could establish that the Board's articulated reasons were false and that retaliation was the real reason for the adverse employment actions. For example, as noted previously, Douglas's testimony about Cook's real reason for his "new

31

direction" indicates that Cook was tired of Morris's complaints and wanted to get rid of her for that reason.

As another example, Morris has presented evidence that the coach hired in Morris's stead, Benita Gordon, did not even meet the posted qualifications for the position, because she had no prior experience at the high school or college level as required.  Because Morris met the qualifications but her replacement did not, that discrepancy is evidence of pretext. To the extent that the evidence is in dispute about the qualification requirements, the court must view the evidence in the light most favorable to Morris and assume that the requirement existed for high school or college level experience.  The evidence is also in dispute regarding whether Cook had the ability to make a unilateral decision to deem Gordon's qualifications satisfactory even when they varied from the posted qualifications, and whether he had the ability to make a unilateral decision to hire her for a new position without invoking an interview panel. In light of these disputes, a jury could find that Cook deviated from Board policies and procedures by hiring Gordon for the Head Coach position without invoking an interview panel and/or without obtaining Board approval for alternatives to the posted qualifications.  Once again, a deviation from Board policies and procedures evidences pretext.  In sum, Morris has established sufficient evidence of pretext to survive summary judgment as to the retaliatory nonrenewal of the Head Coach position for 2010-2011.

As to the 2010 summer weight training coach and strength coach positions, the court notes that disputes of fact exist regarding the reason for not hiring Morris for those positions.  For example, the Board says that the reason it did not hire Morris for the summer weight training position was that it gave her that position in 2008 and she failed to perform it.  As to the

strengthening position, the Board's reason for not hiring her was that it had offered her the position in the past and she turned it down because the stipend was not enough.  Morris testified that the Board never offered her either position, and if the jury believes her instead of the Board's evidence, then that discrepancy would be evidence of pretext.

And, if Morris has established her *prima facie* case and presented evidence of pretext as to the 2010-2011 Head Coach position, common sense dictates that the Board may not avoid claims about retaliation for the next year by blithely arguing that the new Head Coach deserved time to develop her team. Because Cook's approach to hiring for the 2011-2012 coaching positions was simply to renew all coaches who held the positions the previous year, and because Morris has presented evidence of pretext as to the 2010-2011 Head Coach position and evidence of futility as to the 2011-12 application process, the court further finds that Morris has presented evidence of pretext as to the decisions on the 2011-2012 Head Coach position, also.

Therefore,  the court finds that the motion for summary judgment is due to be DENIED as the claims for retaliation based on (1) the Board's failure to re-hire Morris as Head Coach for the 2010-2011 season; (2) the Board's failure to re-hire Morris as Head Coach for the 2011-2012 season; (3) the Board's failure to hire Morris as summer weight training coach for the summer of 2010; and (4) the Board's failure to hire Morris as strength coach for 2010-2011.

### B.  Count III: Title VII Gender Discrimination

In Count III, of the Fourth Amended Complaint, Morris claims that the Board's failure to select her for the positions of summer weight training coach and strengthening coach was based on gender discrimination, and she brings those claims pursuant to Title VII.  The Board argues that although Morris's pleading appears to address the failure to hire for those positions from

2008 forward, she only administratively exhausted claims addressing the failure to hire her in

2010 for that summer (summer weight training position) and the 2010-2011 school year

(strengthening coach, to the extent, if any, that position was separate).[6]  The Board further argues

that no significant difference exists between them, and that, as it hired a woman for the summer

position in 2010, Morris cannot establish a *prima facie* case of gender discrimination.  Assuming

*arguendo* that she is able to establish a *prima facie* case, the Board articulates reasons for failing

to hire her and asserts that she cannot establish that the reasons are pretextual.

    Administrative Exhaustion of Gender Discrimination

    The court will first address the issue of whether Morris has administratively exhausted this

claim.  Her March 2009 EEOC Charge and her November 2011 EEOC Charge did not mention

the summer weight training coach position or strengthening  coach position.  The August 2010

EEOC Charge mentioned both: "My employer has denied me opportunities for advancement in

that, in June 2010, it refused to hire me to either the Training Coach or Strengthening Coach

positions I applied for and instead hired males."  (Doc. 89-15, at 2). As discussed previously, in

her responsive brief, Morris does not argue that her EEOC Charges covered these two positions

for any year other than 2010-2011.  The court agrees that Morris has failed to administratively

exhaust claims regarding these two positions *except* the failure to hire her in 2010 for that summer

---

[6] The Board argues that no significant difference exists between the two positions and that
they are summer assignments.  Morris disagrees, claiming that they are different positions and
whereas the training takes place only in the summer, the strengthening coach is a year-long
position.  The evidence from the Personnel Action Reports indicates that the positions carry
different salaries and that the person who held the position of 2010 strengthening coach was not
one of the five people who held the 2010 summer weight training position, thus supporting
Plaintiff's position.

and/or for the upcoming school year; thus, other than those excepted claims, any Title VII gender

discrimination claims regarding those positions are due to be DISMISSED WITH PREJUDICE.

Abandonment

As an alternative ruling, to the extent Morris may have exhausted her administrative

remedies for the Board's employment decisions regarding the summer weight training coach *for*

*any summer other than 2010* and the strengthening coach positions *for any year other than 2010-*

*2011*, the court FINDS that she has abandoned those claims.

Merits of Gender Discrimination

As to the remaining claims, the court will address them using the framework established in

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973), because no direct evidence

exists to prove discriminatory intent.  Under that framework, she establishes a *prima facie* case in

traditional failure-to-hire cases based on gender by demonstrating that

> (1) she was a member of a protected class;
> (2) she applied and was qualified for a position for which the employer was
> accepting applications;
> (3) despite her qualifications, she was not hired; and
> (4) the position remained open or was filled by another person outside her
> protected class.

*EEOC v. Joe's Stone Crabs, Inc.,* 296 F.3d 1265, 1273 (11th Cir. 2002). The burden then shifts

to the employer to articulate a legitimate, nondiscriminatory reason for its failure to hire, and if

it does so, "the presumption of discrimination is rebutted, and the inquiry 'proceeds to a new

level of specificity,' in which the plaintiff must show that the proffered reason really is a pretext

for unlawful discrimination."  *Id.* (quoting *Texas Dep't of Community Affairs v. Burdine*, 450

U.S. 248, 255-56 (1981)).

2010 Summer Weight Training

The only element that the parties address in the *prima facie* case is the fourth: whether the employer hired someone outside her protected class.  Although the Board claims that it hired a woman instead of Morris for the 2010 summer weight training position, Morris points to evidence that the Board filled *five* summer weight training coach positions and four of the five positions went to males.  The Board presents no authority for the proposition that hiring a woman for one of the five open, similar positions insulates an employer from liability for gender discrimination as to the other four.  Further, given that the Board filled five summer weight training coach positions in the summer of 2010, its assertion that the position Morris sought was the one filled by a woman appears disingenuous.  The court finds that Morris has established her *prima facie* case as to the claim involving the 2010 summer weight training coach position.

The Board articulates a reason for failing to hire Morris as summer weight training coach: her failure to show up for that position when it supposedly hired her for that same position in 2008.  If no dispute of fact existed that the Board had offered Morris that 2008 position and that she had indeed failed to perform it, then this articulated reason would be legitimate and non-discriminatory and, absent evidence of pretext, the court's analysis would end.  However, Morris testified that the Board *never* offered her the 2008 summer weight training position.  Thus, a jury question exists on this issue, and if the jury accepts Morris's version, the articulated reason for failing to hire her would not be legitimate and the discrepancy would be evidence of pretext.  The Board's argument assumes that its version of the disputed facts are true, but the court cannot properly make that assumption; it must view the facts in the light most favorable to Morris at the summary judgment stage, despite the self-serving nature of

36

her testimony.  *See Feliciano v. City of Miami Beach,* No. 12-11397, slip. op. at 18 (11th Cir. Feb. 5, 2013) (affirming the denial of summary judgment and quoting with approval the following language in *Price v. Time, Inc.,* 416 F.3d 1327, 1345 (11th Cir. 2005): "[c]ourts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving.").   Therefore, the motion for summary judgment is due to be DENIED on this claim.

2010 Strengthening Coach

As to the strengthening coach position, the court finds that Morris has established her *prima facie* case.  The Board does not dispute that Morris was qualified for the position and that it hired a male instead of her.  The Board does articulate a non-discriminatory reason for its failure to hire Morris for the strengthening coach: Morris's act of allegedly turning down the prior position because the payment was not enough.  However, as the court noted previously, underlying the "legitimate" reason for not hiring Morris is a dispute of fact, and if the jury believes Morris's version instead of the Board's, the discrepancy would establish evidence of pretext.  Once again, the Board's argument assumes that its version of the disputed facts are true, but the court cannot properly make that assumption. Therefore, the court FINDS that the Board's motion for summary judgment is due to be DENIED as to this claim.

In sum, as to the claims in Count III, the court FINDS that Morris has failed to administratively exhaust claims regarding these two positions *except* (1) the failure to hire Morris for the 2010 summer weight training coach and (2) the failure to hire Morris for 2010-2011 strengthening coach; thus, other than those excepted claims, partial summary judgment is due to be granted and any Title VII gender discrimination claims regarding those positions are

37

due to be DISMISSED WITH PREJUDICE. As to those excepted claims, the court FINDS that

the motion for summary judgment is due to be DENIED.

## V.  CONCLUSION

To summarize, the court finds as follows.

A. Partial summary judgment is due to be GRANTED as to the following claims, which

are due to be dismissed with prejudice for failure to exhaust administrative remedies:

> 1. Count II -
>> a.  Summer weight training coach: The court FINDS that Morris failed to administratively exhaust claims  for the summer of 2009 and 2011.
>> b.  Strengthening Coach: claims for the years 2008-2009, 2009-2010, and 2011-2012.
> 2. Count III -
>> a.  Summer weight training coach: The court FINDS that Morris failed to administratively exhaust claims for the summer of 2009 and 2011.
>> b.  Strengthening coach: The court FINDS that Morris failed to administratively exhaust claims for the years 2008-2009, 2009-2010, and 2011-2012.

B. Partial summary judgment is due to be GRANTED as to the following claims  in
Counts I , II, and III, which are due to be dismissed with prejudice because the Plaintiff has
abandoned them:

> 1.  The court FINDS that Morris has abandoned all claims in Counts I and II for retaliation based on the Board's actions *other than* its failure to hire or re-hire Morris for job positions.
> 2.  The court FINDS that she has abandoned all claims in Counts I and II regarding the failure to receive the position of Athletic Director.
> 3.  The court FINDS that she has abandoned all claims in Count I regarding the failure to hire her for the positions of summer weight training for 2009 and 2011, and of strengthening coach for the years 2008-2009, 2009-2010, and 2011-2012.
> 4.  Alternative ruling: To the extent Morris exhausted her administrative remedies for claims set forth in Count II about the Board's employment decisions regarding the positions of summer weight training coach for 2009 and 2011 and of strengthening coach for the years 2008-2009, 2009-2010, and 2011-2012, the court FINDS that she has since abandoned those claims.
> 5.  Alternative ruling: To the extent Morris exhausted her administrative remedies for claims set forth in Count III about the Board's employment

decisions regarding the positions of summer weight training coach for the summer of 2009 and 2011, and of strengthening coach for the years 2008-2009, 2009-2010, and 2011-2012, the court FINDS that she has abandoned those claims.

C.  Merits

1. The court FINDS that, as to the remaining retaliation claims in Count I , brought pursuant to Title IX, the motion for summary judgment is due to be DENIED; specifically, the remaining claims address the failure to hire her for the following positions:  (1) Head Girls Basketball Coach for the 2010-2011 season; (2) Head Girls Basketball Coach for the 2011-2012 season; (3) summer weight training coach for the summer of 2010; and (4) strengthening coach for 2010-2011.

2.  The court FINDS that, as to the remaining retaliation claims in Count II , brought pursuant to Title VII, the motion for summary judgment is due to be DENIED; specifically, the remaining claims address the failure to hire her for the following positions:  (1) Head Girls Basketball Coach for the 2010-2011 season; (2) Head Girls Basketball Coach for the 2011-2012 season; (3) summer weight training coach for the summer of 2010; and (4) strengthening coach for 2010-2011.

3.  The court FINDS that, as to the remaining gender discrimination claims in Count III, brought pursuant to Title VII, the motion for summary judgment is due to be DENIED; specifically, the remaining claims address (1) summer weight training coach for the summer of 2010; and (2) strengthening coach for 2010-2011.

Simultaneously with this Memorandum Opinion, the court will enter a separate,

consistent Order.

Dated this 13th day of February, 2013.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

.

39